**SO ORDERED: July 30, 2015.**



**Robyn L. Moberly**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DAVE'S DETAILING, INC. dba | ) | Case No. 13-08077 (RLM) |
| THE ALLEN GROUP | ) | |
| | ) | |
| Debtor. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER UNDER 11 U.S.C. § 1129 (b) AND FED. R. BANKR. P. 3020 DENYING CONFIRMATION OF BOTH DEBTOR'S AND CREDITOR'S CHAPTER 11 PLANS**

---

Rarely are creditors given the opportunity to choose between two competing chapter 11 plans. That opportunity exists in this case as both the debtor, Dave's Detailing, Inc. DBA The Allen Groupe ("Debtor") and its competitor and largest unsecured creditor, Appearance Group, Inc. ("AGI") have proposed plans. The Debtor's plan provides 100% payment to creditors, with interest, over time with the balance of all claims paid with a balloon payment in seven or eight years. AGI's plan provides for cash payments upon the "effective date" of the plan, albeit not in full, and the equity security holder is paid nothing and his interests are extinguished.

Neither plan garnered the acceptances of all impaired classes as provided for in §1129(a)(8), so, if a plan is to be confirmed, it will be under the "cramdown" provisions of §1129 (b).   The court held a three- day confirmation hearing beginning on June 15th and concluding on June 17th (the "Confirmation Hearing").   The Court finds that the Debtor's plan is not feasible under §1129(a)(11) and that AGI's plan improperly classified between Classes 4A and 4B and that it unfairly discriminates against Class 4B claimants and cannot be confirmed under §1122(a), §1129(a)(1) and §1129(b)(1)

## I. *Events Leading Up to the Chapter 11 Filing*

Dave Allen formed the Debtor in 1991.  Dave Allen is the president, CEO and sole shareholder of the Debtor.  The Debtor is in the business of cleaning and detailing primarily private aircraft at airports and stocking them with sundries.  It does business at 22 locations throughout the United States and employs approximately 177 employees.  The Debtor owns no real estate, and its assets consist primarily of office furniture, equipment, vehicles, inventory, customer contracts, and receivables.   The Debtor typically incurs startup costs for new equipment, employees, and leasehold when it expands to a new airport location.  Its success in expanding to markets nationwide has been due in part to use of its "Hotlist" tracking system, a proprietary software system that prompts an aircraft owner when a cleaning is due.  The Debtor has contracts with Gulfstream and Chautauqua Airlines, which operates Republic Airways ("Republic").   These two contracts account for approximately 62% of the Debtor's business.  Allen also owns and controls several international entities (the "Foreign Entities") that are engaged in the airplane detailing business overseas. [1]

---

[1] These entities include, but are not limited to, The Allen Groupe, SARL (France), The Allen Groupe, UKLTD (United Kingdom), The Allen Groupe, Swiss (Switzerland), The Allen Group Singapore, and The Allen Groupe, Spain (Spain).  The Allen Group Singapore was formed after this chapter 11 case was filed.

The Debtor's business was significantly affected by the financial crisis of 2008. Increased fuel prices and the stigma attached to private corporate travel in the financial meltdown climate caused a significant decline in the use of private company jets.    In 2010, the Debtor looked to expand in commercial markets and successfully won a service contract with Delta Airlines.  Delta cancelled the contract when the Debtor accidentally damaged a Delta plane during servicing.  The Debtor did not recoup the approximate $200,000 it had incurred in startup costs.

### A. AGI

AGI is a competitor of the Debtor.  The Debtor employed Jeffrey Groth ("Groth"), a former employee of AGI, prior to April 2010, allegedly in violation of his employment contract with AGI.    AGI sued both Groth and the Debtor in a Nevada state court and alleged that the Debtor tortuously interfered with its business by inducing Groth to breach his employment agreement with AGI.  The Debtor and AGI entered into a settlement agreement wherein the Debtor, without admitting liability, agreed to pay AGI $675,000, with $75,000 paid up front and the balance paid over 45 months.  The Debtor also agreed to execute and deliver to AGI a confession of judgment for $1,200,000, which AGI would hold and not file or record as long as the Debtor was current on the monthly settlement payments.  The Debtor paid $345,000 through January 2013.  The Debtor was late on some payments and was warned that late payments would no longer be accepted.  The Debtor did not pay the February 1, 2013 when it was due.  AGI filed the confession of judgment on March 5, 2013, domesticated the judgment in the Marion County (Indiana) courts in April 2013, and began proceedings supplemental to execution to collect that judgment.  Because of these collection efforts, the Debtor's bank account at PNC Bank was

placed on "hold" status.  The Debtor filed this chapter 11 case on July 29, 2013 (the "Petition Date").

AGI filed its proof of claim on October 17, 2013 for $873,120.90, the amount of the confession of judgment and accrued interest less payments made by the Debtor.  The Debtor objected to that claim, and, after hearing, the Court overruled the objection and allowed AGI's claim in full.  AGI is the Debtor's largest unsecured creditor.

### *B.  Leon Mordoh*

Dave Allen, his wife, Melissa ("Melissa"), Robert Showalter and Leon Mordoh ("Mordoh") were directors of the Debtor as of the Petition Date.   Mordoh currently is not a director.  According to the proofs of claim filed by Mordoh in this case, Mordoh loaned the Debtor and Dave Allen $75,000 in May 2013 (the "Mordoh Loan").  Mordoh is the trustee of the Amended and Restated Leon M. Mordoh Revocable Trust (the "Mordoh Trust").  The Mordoh Trust loaned the Debtor $500,000 in May 2011, payment of which Dave Allen personally guaranteed.  The Mordoh Trust loaned Dave Allen, Melissa Allen and the Debtor $250,000 in April 2012 (the "Mordoh Trust Loans").  Mr. Mordoh made the The Mordoh Loan and the Mordoh Trust Loans he was a director of the Debtor.  They are evidenced by promissory notes and secured by pledges of Dave Allen's shares of stock in the Debtor and the Foreign Entities. As of the Petition Date, Mr. Mordoh and the Mordoh Trust were owed in excess of $823,000 (collectively the "Mordoh Claims").

### C.  Other Pre-Petition Unsecured Loans

Promissory notes evidenced the pre-petition private loans made to the Debtor, but determining the extent of the debtor's liability on these loans has been a reoccurring problem. Dave Allen has claimed that some of these loans were made to him directly, and that he, in turn, loaned the funds to the Debtor for which he asserts a claim against the Debtor (the "Allen Claims"). Some loans were made to the Debtor, Allen and Melissa, but a copy of the promissory note bearing Allen and Melissa's signature cannot be located.

The Debtor's schedules show that Tim Ginn ("Ginn"), former CFO of the Debtor, loaned the Debtor $205,000 between October 2010 and November 2011. Larry Zore, a former officer and director of the Debtor, loaned the Debtor $20,000 in August 2011. By the definition of "insider" provided by 11 U.S.C. §101(31) [2], the Ginn and Zore loans were made while they were insiders of the Debtor. Shawn Zore loaned the Debtor $30,000 in January 2012.

Sam and Shelia Schmidt (the "Schmidts") loaned the Debtor, Dave Allen and Melissa $200,000 in August 2008. The remaining amount due on that loan as of August 2009 was restated in another promissory note in August, 2009 but only Allen and Melissa were on that note and there was no express release of the Debtor from the August, 2008 obligation. The Schmidts loaned the Debtor, Dave Allen and Melissa $250,000 in January 2011. The Schmidts wired the $200,000 and $250,000 in loan proceeds directly from their account to the Debtor. Nothing in the record indicates that the Schmidts were insiders of the Debtor.

---

[2] Insiders of a debtor that is a corporation include directors and officers of the debtor. 11 U.S.C. §101(31)(B)(i) and (ii).

The Debtor scheduled the loans from Ginn, Larry Zore, Shawn Zore and the Schmidts but did not designate them as disputed, contingent or unliquidated claims and thus, none of these claimants filed a proof of claim.  Yet, the Debtor objected to these "claims" on the basis that they unenforceable against the Debtor and property of the Debtor under §502(b)(1).

The Schmidts and the Debtor resolved the objection to the Schmidt claim shortly before the Confirmation Hearing. The parties agreed, and AGI consented, that the Schmidts would be allowed an unsecured claim against the Debtor for $270,000 and that the Schmidts were free to pursue collection of the $200,000 and $250,000 notes against Dave Allen and Melissa.

### D.  IBC

First Farmers Bank is the servicing agent for IBC Recovery LLC ("IBC"). IBC is the Debtor's lender and holds a first lien on essentially all of the Debtor's assets, including its receivables and inventory.  As of the Petition Date, it was owed $1,633,240.15.  The Debtor's Schedule D valued the collateral pledged to IBC at over $2.2 million.  A cash use order was negotiated at the beginning of the case.  The cash use has been extended through confirmation and the Debtor has used IBC's cash collateral in the operation of its business without incident.

### E.  Events During the Chapter 11 Case

#### 1.  The Appointment of an Examiner

It is fitting that the Debtor and AGI proposed competing plans, as this case has been a series of battles between them.  AGI has been a worthy opponent.   It has objected to the Debtor's use of cash collateral, the debtor's first day motion to pay wages, the Debtor's motions to extend exclusivity, the Debtor's application to employ Kevin Hamernik ("Hamernik") as the

Debtor's chief restructuring officer ("CRO"), the fee applications of the Debtor's accountants and special counsel, and the Debtor's various original, amended and immaterially modified plans and disclosure statements.  AGI, either in conjunction with the United States Trustee or on its own, has moved for the appointment of an examiner and, later, a trustee.

The Court appointed an examiner on January 30, 2014 and the examiner filed his report on August 1, 2014.   The examiner was tasked with reviewing the Debtor's transactions with insiders and the Foreign Entities, including payments made to Allen's relatives related to travel and compensation.   The examiner also reviewed for accuracy the bankruptcy schedules, statement of financial affairs, financial statements and tax returns.  The examiner was hampered by the lack of time and money and did not complete all of the tasks assigned to him but did devote much of his time to reviewing the Debtor's transactions with insiders.   The examiner found that the Debtor had not been reimbursed for costs it advanced or labor it supplied to the Foreign Entities in their overseas operations, that Allen's mother, Dulce Allen, had been paid a salary but had not worked for the Debtor,  and several other questionable transactions between the Debtor and insiders, particularly Dave and Melissa Allen.

AGI and the United States Trustee moved for the appointment of a trustee.   Those motions were resolved by an agreement that allowed Allen to continue to operate the Debtor, but required him to follow certain expense reimbursement procedures.  These procedures required Hamernik to approve such reimbursements and allowed AGI, IBC, Mordoh and the United States Trustee to review and challenge them before they were paid.

## 2.    Termination of Exclusivity

The Debtor's exclusive period to obtain acceptances of its plan expires 180 days after the order for relief.   Here, the plan acceptance period was extended, but §1121(d)(1) and §1121(d)(2)(B) provide that it cannot be extended beyond "a date that is 20 months after the order for relief under this chapter" (the "Plan Acceptance Period").   The order for relief, or the Petition Date, was July 29, 2013 and the Plan Acceptance Period expired on March 29, 2015.   As a result, the Plan Acceptance Period automatically terminated on March 29, 2015.   Under §1121(c), a "party in interest" may file a plan if the debtor has not filed a plan that has been accepted within the Plan Acceptance Period.   Thus, as of March 29, 2015, the Debtor no longer had the exclusive right to propose a plan.   AGI filed its plan and disclosure statement on March 30, 2015.

## II.  The Proposed Plans

### A.  The Debtor's  Plan

The Debtor's *Amended Plan of Reorganization (Second Immaterial Modification)* divides claims and interests into eleven (11) classes.[3]   Most of the claims will be paid in full, with interest, over eight (8) years, with the remaining balance to be paid with a balloon payment at the end of the 8-year period.   IBC is in Class 1 with an allowed claim of approximately $1.6 million. It will be paid approximately $80,000 on the effective date of the plan[4].   The Debtor will execute and deliver to IBC three replacement notes that mature in 4, 5 and 7 years in which principal and

---

[3] The Debtor's plan provided for treatment of, but did not separately classify, allowed administrative claims, allowed administrative expense claims of professionals, priority tax claims and United States Trustee fees.

[4] The Debtor's plan defines the "effective date" as "the date that is fifteen (15) calendar days after the Confirmation Date".   The "Confirmation Date" is the date that the order confirming the plan is entered by the Bankruptcy Court.

interest are paid over the life of the note, with increased monthly payments kicking in for the 5 year note after the 4 year note matures, and for the 7 year note after the 5 year note matures.  Any balance remaining upon maturity of the 7-year note will be paid in full in a single balloon payment.

AGI is the only creditor in Class 7.  Its claim will be paid in full with 4.25% interest, amortized over 15 years.  The Debtor's plan proposes to pay approximately $21,000 quarterly for 8 years, with the balance paid by balloon payment at the end of year 8.  Class 8 includes unsecured claims, including the Allen Claims.  Class 8 Claims are estimated to be $1.8 million.  The Mordoh Claims are in Class 9.  The Class 8 and Class 9 claims are to be paid in full with interest, amortized over 15 years.  The Debtor's plan proposes to pay quarterly installments of approximately $43,000 and $20,000 respectively, over 8 years, with the balance paid by balloon payment at the end of the 8th year.  The plan specifically provides that obligations owed to Mordoh and the Mordoh Trust by non-debtors (Dave and Melissa Allen) remain in full force and effect and are "completely unmodified" by the plan.  Dave Allen retains his equity interest in the Debtor without contributing new capital.  Under the Debtor's plan, the reorganized debtor had the right to pursue causes of action[5].

The classes and their corresponding treatment is as follows:

| Class 1 | Allowed Secured Claim of IBC | Allow and pay claim in full; installment payments for 4, 5 and 7 years, with entire balance paid by balloon payment at the beginning of |

---

[5] The Debtor's plan defines "causes of action",  in part, as "any and all claims, causes of action, demands, rights, actions, suits….of any kind or character whatsoever held or acquired by the Debtor…including Bankruptcy Causes of Action".  The plan defines "Bankruptcy Causes of Action" as "all turnover, avoidance or preference actions…".

|  |  | Year 8. |
|---|---|---|
| Class 2 | Allowed Secured Claim of IPFS Corporation | Paid in full through adequate protection payments; no payments due going forward |
| Class 3 | Allowed Secured Claim of IRS | Pay in accordance with §1129(a)(9)(C) |
| Class 4 | Allowed Secured Claim of IDR | Pay in accordance with §1129(a)(9)(C) |
| Class 5 | Allowed Secured Claim of Miami Dade County | Paid in full; nothing owed |
| Class 6 | Allowed Secured Claim of Clark County Dept. of Aviation | Deposit securing claim has been drawn down upon; nothing owed |
| Class 7 | AGI | Pay allowed claim in full with 4.25% interest, amortized over 15 years; quarterly payments over 8 years, with balance paid in single balloon payment at the end of year 8. |
| Class 8 | General Unsecured Creditors, including the Allen Claims | Pay allowed claim in full with 4.25% interest, amortized over 15 years; quarterly payments over 8 years, with balance paid in single balloon payment at the end of year 8. |
| Class 9 | Mordoh and Mordoh Trust Claims | Pay allowed claim in full with 4.25% interest, amortized over 15 years; quarterly payments over 8 years, with balance paid in single balloon payment at the end of year 8. Does not modify claimants' rights against co makers and guarantors. Creditor retains security interests in Dave Allen's "foreign entities". |
| Class 10 | Convenience Class (Each claim is this class is a general | Paid in full on the effective |

| | unsecured claim that does not exceed $1,000) | date with 4.25% interest. |
|---|---|---|
| Class 11 | Equity interest of Dave Allen | Allen retains 100% of his equity interest. |

Classes 8 (general unsecureds), 9 (Mordoh and Mordoh Trust) and 10 (Convenience Class), all impaired classes, voted to accept the plan.  Class 7 (AGI) voted to reject the plan. IBC abstained from voting on the plan.

AGI, IBC, Groth, the Schmidts and the Ohio Bureau of Workers Compensation ("OBWC") filed objections to the Debtor's plan.  At the Confirmation Hearing, it was reported that Groth's and that Schmidts' objections had been resolved and that OBCW would be withdrawing its objection.  AGI and IBC both assert that the Debtor's plan is not feasible and that a plan that provides for the full retention of equity over the objection of an impaired lender cannot be confirmed under *In re Castleton Plaza, LP.*, 707 F.3d 821 (7th Cir. 2013).  AGI also objected that the plan was not filed in good faith.

### B.  AGI's Plan

AGI's *Amended Creditor's Chapter 11 Plan for Dave's Detailing, Inc*. divides claims and interests into seven (7) classes but Class 4 has two subclasses, Class 4A and 4B.[6]   Creditors who receive distribution under this plan will be paid in cash (1) on the effective date or (2) the later of the effective date and 30 days after allowance of the claim.  Not all classes are paid in

---

[6]  AGI's plan provided for treatment of, but did not separately classify, allowed administrative claims, priority tax claims and United States Trustee fees.

full and some are paid nothing. IBC will be paid $1,200,000, about $400,000 less than it is owed, in cash on the effective date. [7]

Class 4 consists of unsecured creditors, broken down into two subclasses. General unsecured creditors who are not insiders, including trade creditors with claims more than $1000, are in Class 4A. AGI is in this class and its claim dwarfs other Class 4A claims. The Schmidts are also in Class 4A. General unsecured creditors with unsubordinated insider claims are in Class 4B. Mordoh, the Mordoh Trust, Ginn, Larry Zore and possibly Dave Allen are in Class 4B. Classes 4A and 4B are to be paid $350,000 in cash that they will share on a pro rata basis. AGI will receive the largest pro rata share, and will contribute its pro rata share to only Class 4A claimants. Payment of the $350,000 results in about a 14% distribution to Class 4A and 4B creditors. Redistribution of AGI's pro rata share to Class 4A creditors will result in an estimated 43% distribution to Class 4A creditors.

Insiders with subordinated unsecured claims are in class 6 and receive nothing under the plan. The Court presumes Dulce Allen and possibly Dave Allen are in this class. Dave Allen's equity interest (Class 7) will be cancelled upon confirmation and he receives nothing under the plan. Upon confirmation, new shares in the reorganized debtor will be issued to AGI or its designee. The reorganized debtor will be known as Agia Holdings, LLC ("Agia" or "Reorganized Debtor"). Agia is a Kansas single member limited liability company and Appearance Management, Inc. is it sole member. AGI is a wholly owned subsidiary of Appearance Management.

---

[7] AGI's plan defines "effective date" as "the date the conditions to the Plan becoming effective are either met or waived by the Plan Proponent but not later than forty-five (45) days after the Confirmation Order becomes a Final Order, unless such time is extended by the Bankruptcy Court". The conditions to the Plan becoming effective are that the Plan Proponent has been allowed to conduct reasonable due diligence to verify the Debtor's assets, liabilities and operations and that the Confirmation Order is a final order.

AGI's plan provided that Reorganized Debtor had the right to prosecute all of the Debtor's causes of action and  bankruptcy causes of action [8] which were to be transferred to the Reorganized Debtor on the effective date.  Nothing in the plan affected AGI's continued prosecution of claims or other actions to recover transfers of property of the Debtor.

The classes and their corresponding treatment is as follows:

| Class 1 | Allowed Secured Claim of IBC | To be paid $1,200,000 in cash on the effective date, upon which IBC will release all security interests |
| --- | --- | --- |
| Class 2 | Secured Tax Claims | Paid in full in cash without interest on the effective date, upon which Class 2 claimants will release all liens |
| Class 3 | Other Secured Claims | At AGI's discretion, each Class 3 claimant will receive in full satisfaction of its secured claim (1) return of collateral securing its claim (2) cash equal to value of collateral, net of costs of disposal or (3) such other treatment as agreed upon by the parties. |
| Class 4 (4A and 4B) | 4A- General unsecured claims of non insider creditors | Share $350,000 pro rata with Class 4B claimants; AGI will contribute its pro rata share to Class 4A claimants |
|  | 4B- General Unsubordinated unsecured claims of insider creditors | Share $350,000 pro rata with Class 4A claimants. |

---

[8] AGI's plan defined "causes of action" as all claims, causes of action, demands, rights, actions, suits…of any kind or character…and includes Bankruptcy Causes of Action".  AGI's plan defined "Bankruptcy Causes of Action" as "all causes of action arising under §§542,544,545,547, 548, 549, 550 and 553 of the Bankruptcy Code".

| Class 5 | Allowed Convenience Class Claims (claims of $1,000 or less) | Paid in full in cash without interest on the later of the effective date or the date the claim becomes an allowed claim |
| --- | --- | --- |
| Class 6 | Subordinated Class of Insiders | Claimants in this class shall not receive or retain any property or distribution under the plan |
| Class 7 | Equity Interests held by Dave Allen in the Debtor and any claim that has been recharacterized as equity by order of the bankruptcy court | Equity interests to be cancelled as of the confirmation date; new shares not subject to any pledge in the reorganized debtor to be issued to Agia Holdings, LLC |

Classes 1 (IBC) and 4A (non-insider unsecured claims, primarily AGI's claim), both impaired classes, voted to accept the plan. Class 4B (the Mordoh Claims and other unsubordinated insider claims) voted to reject the plan.

The Debtor, Mordoh, the Schmidts, Dave Allen, Groth and OBWC filed objections to AGI's plan. At the Confirmation Hearing, it was reported that Groth's and the Schmidts' objections had been resolved and that OBCW would be withdrawing its objection. At the Confirmation Hearing, AGI orally immaterially modified its plan and filed that immaterial modification post hearing, on July 6th. The modified plan assigned the right to pursue bankruptcy causes of action to Class 4A and 4B claimants who could employ professionals at their own expense. The Reorganized Debtor retained the right to prosecute all other causes of action. The Debtor, Mordoh and Allen all object to the plan because it is not fair and equitable, it improperly classifies claims and unfairly discriminates among classes. The Debtor and Mordoh assert AGI's plan was not filed in good faith and the Debtor argues the plan is not feasible.

### III. Classification Under §1122, §1123(a)(1)

11 U.S.C. §1129(a) sets forth 16 requirements for confirmation of a chapter 11 plan, the first of which is that "the plan complies with the applicable provisions of this title". 11 U.S.C. §1129(a)(1). Among the applicable provisions are 11 U.S.C. §§1122 and 1123. 11 U.S.C. § 1123(a)(1) requires that a plan designate classes of claims and interests. 11 U.S.C. §1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." A plan proponent has considerable discretion to classify claims, so long as dissimilar claims are not classified together. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994); *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665, 674 (Bankr. N.D. Ind. 1987) ("[Section 1122] does not require that similar classes be grouped together but merely that any group be homogenous."). However, "[t]here must be some limit on a debtor's power [or a plan proponent's power] to classify creditors … The potential for abuse would be significant otherwise." *Teamsters Nat'l Freight Indus. Negotiations Comm. V. U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986); *see also Hanson v. First Bank*, 828 F.2d 1210, 1313 (8th Cir. 1987). "If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed." *In re Holywell Corp.*, 913 F.2d at 873, 880 (11th Cir. 1990) quoting from *Teamsters*, 800 F.2d. at 586; *Hanson*, 828 F2d at 1313. Claims may be classified differently if significant disparities exist between legal rights of holders of the claims which render the claims not substantially similar. *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995); *In re Sentinel Management Group, Inc.*, 398 B.R. 281, 297 (Bankr. N. D. Ill. 2008). Similar claims also "may be divided into separate classes if separate classification is, among other things, premised upon a

legitimate business justification." COLLIER ON BANKRUPTCY ¶ 1122.03[1][a].  Courts have confirmed plans in which insider loan claims were classified separately from non-insider trade creditors.  *See, e.g., In re Carelinc Nat'l Corp.*, 1995 WL 750160 at *2 (E.D. Penn. Bankr. 1995) (confirming plan where insiders were classified separately from non-insider creditors); *In re Crosscreek Apts., Ltd.*, 213 B.R. 521, 550 (E.D. Tenn. 1997).  However, "[s]eparate classifications on the basis of the insider or equity holder status of the creditor does not alone warrant unequal treatment unless equitable subordination principles apply.*"  In re Arn.Ltd. Partnership*, 140 B.R. 5, 13 (Bankr. D.D.C. 1992).

11 U.S.C. §1122 merely requires that claims in the same class be "substantially similar" but the bankruptcy code does not define that term. "Similarity is not a precise relationship, and the elements by which we judge similarity or resemblance shift from time to time in bankruptcy". *Woodbrook Associates*, 19 F.3d at 318.  The Seventh Circuit has not adopted a definition of "substantially similar" but other circuits have considered "the nature of each claim, the kind, species or character of each category of claims".  *In re Draiman*, 450 B.R.777, 791 (Bankr. N. D. Ill, 2011) quoting *In re Johnson*, 21 F.3d 323, 327 (9th Cir. 1994).  Some courts have considered a claimant's alternate sources of recovery (i.e. nondebtor co-maker also obligated on the debt) to determine whether claims are "substantially similar".  See, *In re PTM Technologies, Inc.*, 2013 WL 4519306 (Bankr M.D.N.C., August 26, 2013).  Most courts focus on the legal attributes of the claim, and not status or circumstances of the claimants, and therefore "the emphasis …is upon the type of claim the holder has *against the estate*."  *Draiman*, 450 B.R. at 791, (emphasis added); *In re Frascella Enterprises, Inc.*, 360 B.R. 435, 442 (Bankr. E.D.Pa 2007).

AGI's plan fails under both standards.   If the court is to consider the claimant's alternate sources of recovery, the Schmidt claim is not "substantially similar" to other Class 4A claims,

because it is the only claim in Class 4A for which Dave and Melissa Allen are also personally liable.  Recovery from non-debtor co-makers or guarantors is a substantial legal right which no other Class 4A claimant enjoys.  If the focus is the nature of the claim the claimant holds *against the estate* only, the Schmidts hold an unsecured claim and they are properly in Class 4A.  But, Mordoh, then, too holds only an unsecured claim against the estate and his and the Schmidts' claims are "substantially similar".  AGI must prove a legitimate business justification for classifying the Schmidt and Mordoh claims separately.

The Mordoh Claims, the Allen Claims, and the Ginn and Larry Zore claims were separately classified in Class 4B because of their insider status.  "Insider status alone does not make a claim dissimilar".  *Id*. at 443.  A plan proponent may provide that a claim or class of claims be equitably subordinated to other claims or classes under §510( C ), but it must show that the claimant engaged in inequitable conduct, that the claimant engaged in conduct that injured creditors or gave the claimant an unfair advantage and that subordination of the claim is not inconsistent with the bankruptcy code.  *Holywell Corp*, 913 F.2d 873 at 880.

There has been no showing here that, when Mordoh loaned money to the Debtor, he did so with superior knowledge of the risks involved to warrant separate classification and treatment of his claim.  Even if Mordoh, as director, had the right to be kept informed as to the Debtor's financial condition, he certainly had no day-to-day control over the Debtor and there is no evidence that he used whatever right he has as a director to an unfair advantage.  *See, In re ARN Ltd, Ltd Partnership*, 140 B.B. 5, 13 (Bankr. D.C. 1992).  AGI may separately classify insider claims, but there must be some evidence that the insiders' claims should be equitably subordinated to Class 4A claims and here there is none.  AGI presented no justification for the

classification.  AGI's plan improperly classifies the Schmidt and Mordoh claims under §1122(a), and as such, cannot be confirmed.

### IV. Confirmation Standards under §1129(a)

#### A.  Good Faith under §1129(a)(3)

The Debtor and AGI assert that the other's plan was not proposed in good faith. Although not defined in the Bankruptcy Code, good faith "is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Madison Hotel Assocs.*, 749 F.2d 410, 424-25 (7th Cir. 1984); *see also South Beach Secs.*, 606 F.3d 366, 376 (7th Cir. 2010) ("To be in good faith a plan of reorganization must have a true purpose and fact-based hope of either 'preserving a going concern' or 'maximizing property available to satisfy creditors.'").  Good faith also requires a showing that the payments to creditors evidence a fundamental fairness. *In re Multiut Corp.*, 449 B.R. 323, 342 (Bankr. N.D. Ill. 2011); *In re Smith*, 848 F.2d 813, 817-22 (7th Cir. 1988); *In re Rimgale*, 669 F.2d 426, 432-33 (7th Cir. 1982).  The "good faith" inquiry is limited to the plan itself.  *See In re Madison Hotel*, 749 F.2d at 425.  "To find that a plan does not comply with § 1129(a)(3) generally requires misconduct in bankruptcy proceedings, such as fraudulent misrepresentation or serious nondisclosures of material facts to the court."  *In re Draiman*, 450 B.R. 777, 804 (N.D. Ill. Bankr. 2011) (internal quotations omitted).

The Debtor objects that "the purpose of the AGI Plan is to acquire its competitor at a below market rate through a plan that is not designed to either preserve the going concern value of the Reorganized Debtor or to maximize the property available to satisfy creditors" and that AGI's treatment of creditors is not fundamentally fair.  AGI is not an interloper who

purchased another party's claim in order to obtain advantage against its competitor. AGI is a judgment creditor holding the largest non-insider unsecured claim against the Debtor and has a stake in any reorganization effort. It justifiably believes that any reorganization effort is best undertaken by Agia and not Dave Allen and it has proposed to contribute approximately $3 million of additional funds towards that effort.

The evidence at the Confirmation Hearing demonstrated that AGI is committed to provide more than $3 million plus personnel and support to operate the Reorganized Debtor. AGI's CEO, Don Henry, would bring decades of experience working in and with aviation companies. The Reorganized Debtor is an important business opportunity that would allow AGI to reduce its dependence on a customer currently providing about 63% of its sales. Liquidation of the Debtor would not be advantageous to AGI's business. Mr. Henry confirmed that Debtor would continue operations under AGI's Plan, that Debtor's employees would enjoy a better benefits package, and that any retirement plan obligations would be honored. Nothing about AGI's plan suggests bad faith and there is no evidence that would support a finding of bad faith under 11 U.S.C. §1129(a)(3). The Court finds that AGI's plan was proposed in good faith and not by any means forbidden by law, thereby satisfying 11 U.S.C. § 1129(a)(3).

AGI asserts that the Debtor's plan was not proposed in good faith because Dave Allen will continue to control and manage the Debtor and the Debtor's plan is not feasible.

### B. Feasibility under §1129(a)(11)

Feasibility of a plan is established by showing a reasonable assurance of success; a plan does not have to be a guaranty of success. See *In re Haas*, 162 F.3d 1087, 1090 (11th Cir. 1998) (noting, "The Plan itself must offer a reasonable prospect of success and be workable."); *In re*

*New Midland Plaza Assocs*., 247 B.R. 877, 884 (Bankr. S.D. Fla. 2000); *In re Di Maria*, 202

B.R. 634, 639 (Bankr. S.D. Fla. 1996). Although feasibility does not require proof that the plan

will succeed, there needs to be reasonable assurance of commercial viability. *In re 203 N.*

*LaSalle St. P'Ship*, 126 F.3d 955, 961-62 (7th Cir. 1997) *rev'd on other grounds*, 526 U.S. 434,

199 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Factors a court should consider include the adequacy

of the capital structure; the earning power of the business; economic conditions; the ability of

management; the probability of the continuation of the same management; and any other matter

that may affect the debtor's ability to perform the plan. *Id.* "The feasibility requirement

mandates that the plan proponent offer concrete evidence of cash flow to fund and maintain both

its operations and is obligations under the plan." *In re American Consol. Transp. Cos., Inc.* 470

B.R. 247,255 (D. Wyo.1994), *aff'd* 56 F.3d 77 (10th Cir. 1995).

      The Debtor's financial projections are not persuasive and the assumptions upon which

they were based are not reliable. They do not establish that the plan is feasible or that

confirmation of the plan is not likely to be followed by liquidation or the need for further

financial reorganization of the Debtor. The Debtor's projections assume a 2% increase in

revenue and a gross profit margin of 40%.[9] The Debtor's historical gross profit margin is

significantly less. Using different measures, Debtor has historically hit a gross profit margin of

33.85% (average for the trailing twelve months "<u>Twelve Month Average</u>") and 36.95% (average

of 2011-2013 tax returns and 2014 Income Statements "<u>Four Year Average</u>"), resulting in

---

     [9] Debtor's Disclosure Statement states that the projections of Debtor's performance on
emergence were created based on an analysis of Debtor's historical "Cost of Sales" estimated at 56% for
payroll and 4% for all other direct costs such as materials and supplies used for production. Debtor's Ex.
1 at p.59 of 65. If the Cost of Sales is 60% of gross revenues, then the gross profit is 40%. The
Disclosure Statement then says, "these assumptions are consistent with Debtor's operations during
calendar year 2013 and 2014. (Debtor's Ex. at 56.) Except they are not. Debtor's 2013 and 2014 average
gross profit margin was 36.95%. (June 16 Tr. at 45: 17-19.)

respective gross profit margins that are 6.15% (.0615) and 3.05% (.0305) less than the 40% margin upon which the Debtors' projections are based. For the first four months of 2015, the average gross profit margin is 35.85% ("2015 Average") or 4.15% (.0415) less than the projected 40% gross profit margin.

Based on Debtor's projected 2015 revenues of $10.4 million, each one percent drop in gross margin equals $104,000 in less revenue. If Debtor continues at its 2015 Average instead of its projected 40%, Debtor will produce $431,600 less revenue ($10,400,000 projected revenue x .0415 = $431,600). This loss would eliminate Debtor's projected ending 2015 cash of $323,750. That projected ending cash does not include any payment for ongoing professional fees that are not in the budget and that are reasonably estimated to be $500,000. If Debtor continued for the first five years of its projections at the 2015 Average, the total loss in monies needed to cover expenses and pay debt would be over $2.2 million (total forecasted revenues of $54,122,017 x .0415 = $2,246,063).

Using the Twelve Month Average, the loss in revenue would be $639,600 ($10,400,000 x .0615 = $639,600). Mr. Hamernik testified that due to the seasonality of Debtor's business, the Twelve Month Average is a more reliable indicator than the 2015 Average. The loss in funds needed to cover expenses and pay debts over five years at the Twelve Month Average would be $1.65 million ($54,122,017 x .0306 = $1,656,133). The Debtor countered that its new contracts with Bombardier and possibly Honda Jet and the price increases for the Gulfstream and Republic contracts will make up for any shortfalls if it misses the 40% margin. However, both the new contracts and the price increases appear to have been included in the projections. Adding Debtor's asserted 2% price increase in margin to the Twelve Month Average yields a gross profit margin of 35.85%, which is the same as the 2015 Average. The effects of these new contracts

and price increases do not significantly change the 2015 financial projections based on the 2015 Average.

No other evidence produced at the Hearing was credible to support the size of revenue increase needed to make up for missing the 40% margin. There is a mathematical ratio between revenue and margin and each dollar increase in revenue does not equal a dollar increase to the bottom line. To cover the 2015 Average margin loss of $431,600, and assuming a gross profit margin of 35.85%, Debtor would need to generate $1.2 million more in revenue ($431,600/.3585 = $1,203,905). Using the Twelve Month Average, Debtor would need $1.9 million more ($639,600/.3385 = $1.889 million). The Debtor presented no credible evidence that it would generate increased revenue needed to hit the 40% margin.

Debtor's revenues are trending $192,062 more than budget for the first 4 months of 2015. This is due in part to the seasonality of the Debtor's business where the first quarter brings in the most revenue. While Debtor argues that this over budget performance when annualized would make up for the margin loss, the numbers do not bear this out. Annualized, Debtor's revenue increase would result in $576,188 more in revenues in 2015 than projected. However, that increase would be almost $628,000 ($1,203,905 - $576,188 = $627,717) short of making up for the gross profit loss at the 2015 Average. At the Twelve Month Average, the shortfall would be about $1.3 million ($1.889 million -$576,188 = $1,312,812). It is likely that the annualized revenue based on the Debtor's most lucrative quarter would be overstated, resulting in an even greater shortfall.

The Debtor's 2015 expenses were less than budgeted and the Debtor contended that reduced expenses would cover the shortfall in gross profit margin. However, through April 2015, Debtor is $75,542 below budget in producing gross profit revenue, but only $1,082 under

in its projected expenses.  After subtracting the full amount of the professional fees for the first four months, the impact on net profit is a negative $41,291, resulting in an average impact to the gross profit margin of negative 3.16% for 2015.  Because the margin is so low, the current increase rate in revenues is actually harming more than helping Debtor's bottom line because the Debtor's growth rate is not high enough to reach an escape volacity from its margin loss.

The Debtor's projections underestimated certain salary and insurance costs.  The salaries and benefits for officers needed to replace Mr. Hamernik and his employees when his company is no longer performing the duties of chief financial officer and chief operating officer[10] is estimated to be $150,000, plus 10% for taxes and benefits.  The new Controller's annual salary was underestimated by $50,000.  Additional general insurance costs in 2015 would be $107,000 and health insurance costs associated with the Affordable Care Act total $116,000 which is reasonable given the Debtor's 2014 actual expenses and its projections for 2016.  Debtor effectively disputed none of these increased omitted expenses.  These understated expenses total $438,000 annually.  If the amount of the understated expenses is added to the amount of additional revenue that Debtor would need to generate to cover its loss on the gross margin,[11] the effect would be a $936,000 swing in Debtor's financial performance and Debtor would show a loss in 2015 of $490,000 instead of its projected profit of $445,000.[12]  Using the Four Year Average and the corrected annual expenses, the Debtor would show a $3.5 million loss at the end

_____

[10]  Debtor tries to ameliorate these increased expenses by stating that Debtor could just delay or not hire a COO. (June 16 Tr. at 101-102).  However, given the deficiencies in Debtor's management, not hiring necessary officers undermines Debtor's commercial viability.

[11]  Barron calculated that the additional revenue needed to cover the loss on the gross margin above the Debtor's current run rate of 2015 revenue would be $600,000, which she later reduced to a more detailed number of $588,000.  (June 16 Tr. at 61)

[12]  This calculation used on $75,000 for the COO salary to account for only 6 months remaining in 2015.

of the first five years after debt payments.  At the 2015 Average, the 5-year loss increases to $4.25 million, and to closer to $5 million if the additional $500,000 in professional fees are added to the debt.  The Debtor' plan provides no information on how the Debtor will pay the balloon payments at the end of Year 8.  Given the amount of losses in as early as Year 5, it is unlikely that the Debtor will secure financing or a capital contribution to meet those plan obligations.

The Debtor argued that the amount of Class 8 general unsecured debt was overestimated and that its pending objections to some of those Class 8 claims will reduce the amount owed to this class.   There was no evidence as to the Debtor's probability of success in that claims litigation, or whether the reduction in claims will exceed any litigation costs expended.  It is the Debtor's mere speculation that reduced claims will make up for any expenses not accounted for in its projections.  Besides, this is too little, too late.  After failing to investigate these claims for over 20 months, amending its Schedules four times and each time listing all the loan claims (and on the fourth attempt, listing them twice with the original holder and then again as the Allen Claims) as undisputed, it is unreasonable to now try and repair faulty projections through the unknown outcome of claims objections.

Although Debtor operates in an industry that is particularly sensitive to demand and to the state of the overall economy, Debtor's operating projections leave no margin for error and provide no contingency budget line item.  Per Debtor's Plan projections, at the end of Year 5, Debtor will have generated a cumulative net negative $200,000 cash flow without any payment for the additional $500,000 in administrative expenses that are not reflected in its budget.  Debtor's only contingency plan seems to be further financial reorganization.

Hamernik tested his assumption that Debtor could make the debt payments using Debtor's 2014 performance and examining Debtor's 2014 EBITDA for debt payments, Debtor's cash accumulation during bankruptcy and Debtor's escrowing cash in a separate account. Hamernik determined that Debtor had generated on an average monthly basis $65,000 in cash to cover the projected average debt payments of $62,000. However, when the omitted expenses are deducted from that average cash, Debtor's available cash flow drops from Mr. Hamernik's positive $3,000 per month to a negative $ 33,500 per month ($438,000/12 =$36,500 in additional monthly expenses).[13]

Furthermore, the Debtor has been able to accumulate cash because it has not paid its prepetition vendor debt of $670,000 or its normal ordinary course of business professional fees, and has delayed paying maintenance and repairs, and collecting receivables. The Debtor scrambled to cover payments, paid bills late and bounced payroll in December 2014 on account of the tightened cash flow caused by segregating cash in an escrow account. Upon emergence from the chapter 11, any cash "escrow" would not be available to cover cash shortfalls, but would be paid to Debtor's creditors. Debtor's projected balance sheet indicates a cumulative net cash at the end of the first 5 years of $589,756. Subtracting the additional $500,000 in professional fees, the cash at the end of 2019 cash would be about $90,000. An $11 million revenue company with over 200 employees is not on financially sound footing running negative cash with less than half of one payroll in the bank. The Debtor did not meet its burden of proof to show that its Plan is feasible.

---

[13] On the third day of the hearing, Debtor attempted to show sufficient debt service coverage using 2015 EBITDA figures through April and adding in various adjustments for asserted lower claims and other unproven adjustments. (June 17 Tr. at 58-63) However, after adjusting for the missing expenses for the first four months of 2015 and normalizing the overhead expenses, the available monies are still less than the calculated debt payment -- even if a lower total claim debt is used and not adjusting for any seasonal revenue skew. (June 17 Tr. at 66-68).

In sum, the Debtor's Plan is based on financial projections that have no historical basis in fact, understates expenses, has no contingency plan, and does not include payment of over $500,000 in professional fees. Debtor asserts it can pay all of its operating expenses and $7.2 million in debt solely from cash flow, with no new investment and no financing. Debtor has the burden to prove feasibility. Debtor did not so prove. Debtor fits the profile of a company at high risk of failure. Sixty-two percent of its revenues are generated from two customers. Debtor's customer contracts are cancellable on 30 – 90 days' notice. Debtor's historical financial information is incomplete and incorrect. Debtor continues to lack good accounting controls. Debtor has no non-compete agreement with its CEO. Debtor's business is seasonal. Debtor's business provides a discretionary service to customers in a volatile industry. Debtor has no new investment and no new financing and has offered no evidence on how it will secure enough cash to make the balloon payments provided for under its plan. Debtor is grossly insolvent both administratively and on its balance sheet. Debtor has asserted that its ability to operate is highly dependent on Dave Allen's continued ownership, but his ownership shares are pledged to secure nearly a $1 million of personal debt that is in default; he is at risk of personal bankruptcy; and he is now in divorce proceedings. Given all of these high risk factors, both the accuracy of Debtor's financial projections and the lack of contingency funds for errors have increasing importance.

It will take skilled and adept leadership to operate the Debtor post confirmation, given its unreliable financial projections. The Debtor's current management of Dave Allen is not up to the task. Mr. Allen has exhibited levels of ignorance with respect to legal and financial information of his company. Even the watchful eyes of court-appointed professionals have not been sufficient to cause Mr. Allen to conform his behavior and give due regard to the fiduciary duties he owes to creditors.

There have been many allegations of financial and operational irregularities at Debtor. Most of them trace back to Mr. Allen. At the very first hearing in this case, the Court discovered Debtor had paid a prepetition claim that it was before the Court seeking authority to pay. Debtor has filed an amended Schedule of Assets and Liabilities four times and despite loan documents that clearly indicate certain debts as being debts of Mr. Allen personally, Mr. Allen certified each of those schedules that falsely described his personal loans as obligations of the Debtor. Evidence and testimony during hearings on the appointment of an examiner and later to appoint a chapter 11 trustee raised other allegations of irregularities in Debtor's operating and financial reporting, including misuse of company expense accounts and ghost employment of Mr. Allen's mother. In response to the Court's questions about the "fluidity" of Debtor's schedules, Mr. Hamernik expressed frustration with the Debtor's lack of historical record keeping and stated that there had been too much turnover among those who managed Debtor's accounting. Debtor lost its most recent controller, Jean De Jesus, on April 2, 2015. [14]

The testimony of Ms. De Jesus reinforces troubling concerns over Mr. Allen's management of Debtor. In the months leading up to her departure in early April, she raised issues about Mr. Allen's expense reports, lack of receipts, his use of another employee's company debit card and the company's prepaid gas cards, but each time these were rebuffed as "petty" or "immaterial" or she was told that undocumented expenses were "David approved." .

In March 2015, Ms. De Jesus found significant discrepancies when reconciling Debtor's accounts receivable. Ms. De Jesus noticed that the Debtor was posting "big, huge credits" that reduced accounts receivable that were previously reported to the Court as accrued income. She

---

[14] The May 5, 2015 deposition of Jean De Jesus was admitted in evidence as Creditor's Ex. D. (June 17 Tr. at 15-16.) The Court allowed parties until June 23, 2015 to submit any additional objections not made during the deposition. (Id. at 16-17.) No party requested an enlargement of that deadline. No additional objections to her testimony were filed or served.

testified that the Gulfstream location in Savannah, Georgia and the Flexjet account were both overstated and she was directed to make adjusting journal entries without any proper accounting justification.

Ms. De Jesus also noticed that Debtor had posted a March 1, 2015 payment from the Singapore airshow, SIA, to the Debtor, but she also knew from a recent bank account statement that The Allen Group Singapore ("TAG Singapore"), an entity controlled by Dave Allen, had actually paid the money. What she uncovered was that SIA, at Dave Allen's request, had already paid the $37,000 receivable owed to the Debtor to TAG Singapore. Dave Allen used the Debtor's funds to advance the startup costs of the Singapore location where TAG Singapore could service Bombardier aircraft. Bombardier, a client with whom the Debtor did about $1.1 million in business in 2014, was slow in reimbursing the startup costs but eventually paid them to TAG Singapore. Hamernik had not preapproved the Debtor's transfer of funds to TAG Singapore to advance Bombardier's startup costs, and the transfer was outside the ordinary course of Debtor's business. David Allen caused TAG Singapore to spend the entire deposit. This was not disclosed to the examiner, the U.S. Trustee, or during Mr. Allen's testimony in the October 2014 hearing on the motion to appoint a Chapter 11 trustee. Nor did Mr. Allen reveal his diversion of the money to Debtor's accounting personnel or during any of his many conversations with the CRO. It was not until May 2015 that Mr. Hamernik first learned about Mr. Allen's diversion and repayment. He testified that Appearance Group's counsel brought Mr. Allen's diversion to his attention and that he was unlikely to have found it on his own. In addition to diverting the SIA receivable to a company he owned, Dave Allen also caused the Debtor to "loan" the services of two payroll employees (Amy Canonico and Bennett Hilton) to TAG Singapore without compensating the Debtor for its payroll expense.

The Debtor was experiencing significant cash flow problems at the same time Mr. Allen diverted funds to his Singapore company. Ms. De Jesus testified that paychecks were late or bounced in December 2014 and March 2015. She testified that during the bankruptcy, "[a]ll trade bills were being paid late," and it took almost three months to pay Debtor's general liability insurance premium. Mr. Hamernik confirmed that it was sometimes necessary for the Debtor to take cash from the professional fees escrow account to meet Debtor's daily cash needs.

Given Mr. Allen's track record, it is not surprising that Debtor and its professionals have concluded that a new committee is necessary to monitor Mr. Allen's spending and to keep him from reverting to his prior behaviors. The issue before the Court is whether a CEO who needs a monitor should be put back in charge of a financially strapped company. Mr. Allen testified that he wants the committee because "It'll hold me accountable." Competent and informed CEOs generally do not need oversight committees, especially an oversight committee over which the CEO has the power to appoint and dismiss members. Mr. Allen has had 22 months to reform his ways and conform his behavior to a responsible manager. He appears to have failed. As the Court previously observed, the Debtor's CEO is uninformed in material ways. Nothing disclosed in the Confirmation Hearing changed that observation.

After two years in bankruptcy, Debtor is now more insolvent than when it filed. Debtor is more than $1.6 million administratively insolvent. On the effective date of Debtor's Plan, it will owe $7.2 million balanced against $3.4 million in total assets.[15] Removing the "uncollectible" shareholder receivable of $228,077 and the affiliated company receivables of $704,363 (which Debtor has likewise had difficulty collecting);[16] Debtor's liabilities exceed its

---

[15] *See* Debtor's Ex. 9 adding claims as of the effective date plus $1.6 million in unpaid professional fees and not including current payables and Creditor's Ex. B (April 2015 Balance Sheet).

[16] *See* Debtor's Ex. 2 (Liquidation Analysis).

assets by nearly $5 million. Debtor's financial projections as set forth in its Disclosure Statement were built around an assumed profit margin of 40%. Monies generated by a company's operating profit is important because that governs the ability of the company to cover its overhead costs, make debt payments, and is used to accurately set pricing for its services or products. If the Debtor's gross profits are less than expected, the Debtor has to either significantly grow revenues, cut expenses, or stretch its cash by delaying or not making payments. A confirmed plan should restructure and reduce the financial stresses on the Debtor, but the Debtor's Plan would increase its financial stresses. Debtor's Plan is a too speculative promise. The Debtor projects it will have $589,756 in total cash on hand at the end of the first five years. This is too small a cushion to provide a reasonable probability of success. Given that Debtor's total cash on hand at the end of the first five years is projected to be only $589,756, such a small cash cushion after five years is too thin to provide a reasonable probability of success. The Debtor's current leadership, which will remain in place, does not evoke confidence. The Debtor's plan is not feasible and cannot be confirmed under §1129(a)(11).

AGI has been in the business of detailing private airplanes since 1991 and has been under the current ownership and management since 1999. It operates a nationwide network of 24 separate business locations and employs a full time work force of 160 people. Its 2014 net annual income exceeded $2.7 million. It had assets in excess of $3.5 million and no secured or unsecured loan debt in 2014. Its 2014 audited financial statements show an equity value of more than $7.8 million. Its average annual revenue is $12 million, and 63% of its revenue comes from its business with Beechcraft. It will borrow $1.5 million of the approximately $3 million it intends to contribute under its plan and that loan has been approved with no further conditions to be met. Mr. Henry, the current CEO of AGI, will serve as the manager of Agia and the CEO of

the Reorganized Debtor.  Henry's skills match up well to that which is required to assume control of the Debtor's business operations.  AGI's plan is feasible.

### IV.  Confirmation Standards under the Cramdown Provisions of §1129(b)

Pursuant to 11 U.S.C. § 1129(b), "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent under the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

### A. Plan Cannot Discriminate Unfairly - §1129(b)(1)

Mordoh and Allen allege that AGI's plan unfairly discriminates between Class 4A and Class 4B claimants.  Whether a plan discriminates unfairly against a dissenting class is determined by considering "whether the proposed discrimination has a reasonable basis and is necessary for reorganization."  COLLIER ON BANKRUPTCY ¶ 1129.03[3][a], citing *In re 203 North LaSalle Street Ltd. P'ship*, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), aff'd, 195 B.R. 692 (N.D. Ill. 1996), aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, 526 U.S. 434, 119 S.Ct. 1411, 143 L. Ed. 2d 607 (1999).  A plan may unfairly discriminate if there is a large discrepancy in the percentage recovery between similarly situated creditors.  *In re Tucson Self-Storage, Inc*., 166 B.R. 892, 898 (9th Cir. BAP 1994); *In re Sea Trail Corp*., 2012 WL 5247175 at *8 (Bankr. E.D.N.C. October 23, 2012).  The discrimination must be "unfair" and a plan does not unfairly discriminate in its treatment between classes if it serves a rational, legitimate purpose and it is necessary for the reorganization of the debtor.  *In re Dow Corning Corp.,* 244 B.R. 705 (Bankr. E.D. Mich. 1999).

In determining whether a plan discriminates unfairly, courts consider various factors, among them, whether (1) the discrimination has a reasonable basis; (2) the debtor (or plan proponent) can consummate a plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis for it . *In re Copeland*, 742 F.3d 811, 813 (8th Cir. 2014) (chapter 13 plan);  *In re Ambanc La Mesa Ltd. Partnership*, 115 F. 3d 650, 656 (9th Cir. 1997)(chapter 11 plan); *In re Lesser*, 939 F. 2d 669, 672 (8th Cir. 1991) (chapter 13 plan); *In re Gonzales*, 172 B.R. 320, 326 (E.D. Wash. 1994) (chapter 13 plan); *In re LightSquared, Inc*., 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) (chapter 11 plan); *In re Hyatt*, 509 B.R. 707, 715-716 (Bankr. D.N.M. 2014)(chapter 11).

AGI contends that its disparate treatment of 4A and 4B claims is not "unfair" because "gifting AGI's own property back to certain creditors with whom the reorganized debtor expects to have a continued relationship is not unfair discrimination…"  See, *In re Worldcom Inc.*, 2003 WL 23861928, *61 (S.D. N.Y. 2003) ("Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan by other creditors are not impacted".)  This gifting doctrine "permits creditors, if they wish, to 'gift' part of the distributions to which they'd be otherwise be entitled to junior classes or interests, even if the gift results in unequal distributions to classes that would otherwise be *pari passu*…"  *In re DBSD North America, Inc*., 419 B.R. 179, 210 (Bankr. S.D.N.Y. 2009).  The "gifting doctrine" can apply to gifts from secured or unsecured creditors.  When the gift comes from a secured creditor, it is more likely to pass muster and be held not to unfairly discriminate "under the plan" because the secured creditor has property interest in the property gifted and if it were to enforce its security interest , the property would not be estate property subject to distribution under the plan.  *Id.* at 211.  Even under these

circumstances, the secured creditor must have a legitimate business reason for making the gift. *Id*. at 212; see also, *In re Journal Register*, 407 B.R. 520,  534 (Bankr. S.D.N.Y. 2009) (debtor's CRO testified that the gift – which was to be segregated in a "trade account" which did not constitute property of the debtor or the reorganized debtor -- was necessary "to ensure the goodwill of trade creditors essential to the [d]ebtor's postconfirmation survival"); *In re Parke Imperial Canton, Ltd*., 1994 WL 842777 (Bankr. N. D. Ohio, November 4, 1994) (plan proposed by secured creditor who contributed $10,000 to one class of unsecured creditors over another confirmed).  But see,  *In re Sentry Operating Company of Texas, Inc*., 264 B.R. 850 (Bankr. S. D. Tex. 2001) (plan jointly proposed by debtor and secured creditor unfairly discriminated against unsecured creditors receiving 1%  where other unsecured creditors received  99% as a result of secured creditor's gift).

A plan is much more likely to be held to unfairly discriminate against certain classes when the gift comes from an unsecured creditor. See, *DSDS*, 419 B.R. at 211-212, fn 139  (use of gift doctrine "more controversial" when the gift comes from unsecured creditors",  with the court there noting that it need not decide whether members of an unsecured class can gift their distributions to a more junior class of creditors or equity.)  The "most prominently cited case rejecting the gifting doctrine …involved gifts from unsecured creditors".  *Id*. at 212.  A district court denied confirmation where the plan provided that unsecured asbestos claimants would waive their rights to new warrants being distributed to them under the plan and gift them to equity, over other unsecured creditors.  *In re Armstrong World Industries, Inc*., 320 B.R. 523 (E.D. Pa. 2005) aff'd, 432 F.3d 507, 514  (3rd Cir. 2005) (where Court of Appeals observed that cases allowing secured creditors to gift "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they

receive"). This court has not found, and the parties have not cited, a case where a plan proposed by an unsecured creditor who gifted to its own class its share of distributions was confirmed over an "unfair discrimination" objection.

AGI is not free to gift its money to whom it chooses because it, as plan proponent, must meet the §1129 confirmation standards. AGI has failed to show it has a legitimate *business* reason for making the gift to the class *in which it belongs*. AGI holds more than 2/3 in amount of the total Class 4A claims, the Schmidts hold the next largest amount and trade creditors with claims more than $1000 hold the rest. AGI has not argued – let alone shown -- that trade creditors are essential to confirmation and consummation of its plan and that assured good trade creditor relationships post confirmation justify a higher percentage to that class. Nor has it argued, nor can it argue, that continuing business relationships with the Schmidts is essential to reorganization. AGI, by voting for its own plan in a class that it dominated, was guaranteed the vote of at least one impaired, accepting class, so it did not put the Schmidts in Class 4A to obtain an acceptance it otherwise would not have. However, treating Class 4A preferentially has no legitimate business purpose; distribution under AGI's plan is a "one shot deal" and is not spread over time and is not dependent upon the reorganized debtor's future success. Continued support of the reorganized debtor's post confirmation operations is irrelevant because their payment under AGI's plan is not dependent upon it. The approximately $3 million being contributed by AGI was arrived at by estimating what AGI could safely afford to pay up front, not by projected revenues earned post confirmation.

With no legitimate business reason shown, the AGI plan unfairly discriminates between Classes 4A and 4B and cannot be confirmed under §1129(b)(1).

### B.  Plan Must be Fair and Equitable - §1129(b)(2)

#### 1.  Extinguishment of Dave Allen's Equity Interest under AGI's Plan

For a plan to be "fair and equitable" with respect to a class of interests, it must provide that the interest holder "receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest…"  §1129(b)(2))(C)(i).  Thus, it follows that, to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn.  *In re Oneida Ltd*., 351 B.R. 79, 87 (Bankr. S.D.N.Y.) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 441 (1968)) ("Since participation by junior interests depends upon the claims of senior interests being fully satisfied, whether a plan of reorganization excluding junior interests is fair and equitable depends upon the value of the reorganized company.")   This proof must take the form of a "going-concern" valuation of the reorganized company—an estimate of "the present worth of [its] future anticipated earnings"—as of the day the plan would take effect.  *Protective*, 390 U.S. at 442–43; see also *Assocs. Commercial Corp.* v. *Rash (In re Rash)*, 90 F.3d 1036, 1053 n.23 (5th Cir. 1996) (*en banc*). ("In Chapter 11 cases, a going-concern valuation of the reorganized debtors is a necessary step in applying the 'fair and equitable' standard to . . . a class of interests in a cram down.") (emphasis omitted), *rev'd on other grounds*, 520 U.S. 953 (1997); Collier on Bankruptcy ¶ 1129.03[4][a][ii].  This Court has "broad discretion to determine the extent and method of inquiry necessary for a valuation . . . depending on the facts of each case." *In re SGPA, Inc.,* 2001 Bankr. LEXIS 2291, at *36 (Bankr. M.D. Pa. Sept.

28, 2001); Collier on Bankruptcy 1129.05(3)(a).   Valuation is often defined as the price at which a willing seller would sell and a willing buyer would buy, and a contingent non-consummated offer can be material to a court in reaching a valuation conclusion.   *See In re Oneida Ltd.*, 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006).

For a plan to be "fair and equitable" as to a class of unsecured claims,  the plan must provide that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property". 11 U.S.C. §1129(b)(2)(B)(i).  This provision is known as the "absolute priority rule" and requires that the equity class not retain their interests if creditors senior to the equity class are not paid in full.  "A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (citing In re *Genesis Health Ventures, Inc.,* 266 B.R. 591, 612 (Bankr. D. Del. 2001)).  "If former stockholders' interests are eliminated, a valuation is required to make sure that the senior classes of claims are not being provided for more than in full. If former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed. Conversely, for a plan to be confirmed when stockholders are eliminated, creditors must not be provided for more than in full."  *In re MCorp Financial, Inc.,* 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992).

Dave Allen is retaining his equity interest in the Debtor without contributing any new value under the Debtor's plan.  Debtor, David Allen, and Leon Mordoh all object to AGI's Plan on the basis that AGI is not paying enough for the Debtor and is receiving more than what it is owed.  They allege that AGI has not provided any evidence on Debtor's enterprise value or on the value of Mr. Allen's equity interest because no "valuation" expert testified.  In the

circumstances of this case with Debtor having proposed a 100% payment plan, a valuation expert would have reviewed Debtor's projections, tested and corrected them as necessary and then determined Debtor's capacity to generate cash to pay operational expenses, pay the debt, and contribute the excess to equity. That is exactly the analysis performed in determining the feasibility of Debtor's Plan. That analysis concluded that Debtor would not generate sufficient cash to pay its expenses and the debt, much less generate anything left over for equity. Given the substantial testimony that Debtor would not only not generate sufficient cash to pay its debt, but would experience negative cash flows, the equity of Debtor has no value, and AGI's Plan is fair and equitable to Class 7. Because no classes below the unsecured creditors' classes are receiving any value, AGI's Plan is also fair and equitable to the classes above the equity.

As Mr. Henry testified, when AGI was determining a market value for taking on the risk of Debtor's company, it considered the projections of Debtor's future operations contained in Debtor's Plan. While it may be out of the ordinary to prove the value of equity based on equity's proffered plan being not feasible, in these circumstances, it is logical and proper and there is no statutory nor controlling case law that requires the testimony of a "valuation" expert. Because Debtor's projections propose to pay 100% of the debt, if the projections prove not feasible and Debtor does not produce enough cash flow to pay all its debt, then it cannot produce any cash flow that would create value in the equity.

Mr. Hamernik testified "[t]he going concern value is really driven based upon what value does the reorganized debtor have based upon its ability to generate cash flow on a going-forward basis." He further elaborated on "enterprise value" as being dependent on the "ability to generate revenue [and] manage expenses." Finally, Mr. Hamernik explained that a company that negatively cash flows will not have any operating value and would only have enterprise value if

37

it had some "significant intangible value like Pepsi." Debtor has no significant intangible asset. Bernadette Barron, AGI's expert, testified that the "going concern value is the market place value of a company assuming that it continues in operations very similar to what is currently operating."

Mr. Allen presented no evidence of any value of his equity.  Hamernik, the Court approved CRO, admitted that the Debtor is balance sheet insolvent.    AGI's expert, Bernadette Barron, agreed.  Ms. Barron presented evidence that Debtor will not be able to fund its plan and will negatively cash flow on a go-forward basis.  .

There was evidence at the Confirmation Hearing that the Debtor offered to sell its assets to a potential buyer for $4 million in late 2014.  The proposed sale included cancellation of Dave Allen's equity interest.  The Debtor's total debts exceed $4 million.  Hamernik testified that as the CRO of Debtor, he would have advised selling Debtor at the price it offered.  In the absence of contrary evidence, Dave Allen's equity interest is $0.  The plan is "fair and equitable as to Class 7.

### 2.  Retention of Dave Allen's Equity Interest
### Without Contribution of New Value under Debtor's Plan

"A plan of reorganization that includes a new investment must allow other potential investors to bid," because "competition is the way to tell whether a new investment makes the senior creditors (and the estate as a whole) better off."  *In re Castleton Plaza, LP,* 707 F.3d 821 (7th Cir. 2013) (citing *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999)). In *Castleton*, the debtor revised its plan to provide for full  payment of the secured lender's claim, over time.  The plan provided that the wife of the Debtor's sole shareholder would contribute capital and would receive all of the stock in the

reorganized debtor.  The secured lender objected to the plan, arguing that the equity to be retained by the spouse had not been market-tested as provided for in *LaSalle*.  The debtor contended that the absolute priority rule did not apply and that the plan was not subject to the *LaSalle* market test because the objecting lender was being paid in full.  *Castleton* held that the spouse who was contributing capital was an "insider" and that "[a]n impaired lender who objects to any plan that leaves insiders holding equity is entitled to the benefit of competition".  707 F.3d at 824.

    While Debtor refers to his Plan as a 100% payout of all debts of the Debtor, it does not pay the debts according to their terms.  The Debtor's Plan vests all equity in the reorganized debtor in David Allen without Allen contributing to keep that equity.   IBC is impaired under the Debtor's Plan and has objected to it.  Debtor's Plan proposes to have Mr. Allen retain his equity over the objection of Debtor's impaired senior secured lender without any market test for the value of the equity. Debtor's Plan does not comply with *Castleton Plaza* and it cannot be confirmed under §1129(b).

### 3. *Application of Castleton to AGI's Plan*

    The AGI Plan includes a new investment by AGI in the form of the money AGI proposed to contribute to fund the AGI Plan and acquire the Equity in the Reorganized Debtor. The Debtor argues that AGI likewise is required to market-test the debtor's equity to determine whether AGI's investment is adequate.

    *Castleton Plaza* does not apply to AGI's Plan in the way Debtor argues.  AGI is not "retaining" any equity interest "on account of" its interest in the Debtor; old equity is being canceled entirely.  The holding in *Castleton Plaza* applies to shareholders or insiders – not to non-insider third parties – obtaining equity in a reorganized debtor.  *See* 707 F.3d at 821-22,

("Competition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider.")  "Insider" under the Bankruptcy Code means an insider of Debtor.

Though *Castleton Plaza* is not applicable to AGI's Plan[17], the facts of this Chapter 11 Case do provide for competition. "[T]he best way to determine value is exposure to a market…[t]his is a point of some significance, since it was, after all, one of the Code's innovations to narrow the occasions for courts to make valuation judgments . . . " *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  The termination of exclusivity provides an open market for competition in the form of competing plans.[18]  Debtor's exclusivity to propose a plan of reorganization ended on March 27, 2015.  Any party in interest has been free to propose a competing plan at any time since exclusivity ended. This open market is sufficient competition to satisfy §1129.  *See, e.g.*, *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("Where the Court is required to consider the preference of creditors in choosing which competing plan to confirm … and under the circumstances of this case where LMA has indicated its intent to purchase the Debtor's equity interests, the competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104*

---

[17]  The holding is applicable to Debtor's Plan, however, and Debtor's Plan cannot be confirmed over the objection of the secured lender absent a market auction for the equity proposed to be retained by Mr. Allen. *See Castleton Plaza*, 707 F.3d at 821.

[18]  Although the *Castleton Plaza* decision rejected termination of exclusivity as a means for providing competition, that decision again applies to equity retained or purchased by an insider.  *See Castleton Plaza,* 707 F.3d at 824.

*Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.")  As to Dave Allen, AGI's plan is fair and equitable under §1129(b).

Accordingly, the Court finds that

(1) The Debtor's plan cannot be confirmed because it is not feasible under §1129(a)(11) and it is not "fair and equitable" under §1129(b) in that it provides that equity will be retained without allowing IBC to credit bid its interest; and

(2)      AGI's Plan cannot be confirmed under §1129(a)(2) because (1) the Schmidt and Mordoh claims are not properly classified under §1122(a) and (2) it unfairly discriminates against Class 4B creditors under §1129(b)(2).

# # #